UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NOLAN J. BROUSSARD, JR.      CIVIL ACTION

VERSUS           NO.  04-2471

STOLT OFFSHORE, INC.      SECTION: "S" (5)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Nolan J. Broussard, Jr. has sued defendant Stolt Offshore, Inc. under the Jones Act, 46 U.S.C. App. § 688, based on the negligence of Jose Marcos Arias Ayala, a fellow crew member on the vessel *Seaway Rover*, and under general maritime law for the unseaworthiness of the *Seaway Rover*.   Stolt has petitioned to limit its potential liability for Broussard's injury under 46 U.S.C.App. § 181 *et seq*., the Limitation of Liability Act.  The three day trial proceeded as a non-jury trial.

A.  **Applicable law.**

   1.  **Negligence under the Jones Act.**

The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law . . . . "  46

1

U.S.C.App. § 688.[1]  Broussard is entitled to recover under the Jones Act "if his employer's

negligence is the cause, in whole or in part, of his injury." *Gautreaux v. Scurlock Marine, Inc.*,

107 F.3d 331, 335 (5th Cir. 1997) (*en banc*).  Stolt is vicariously liable for the negligence of its

employees and agents.  Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6-22, at 348 (4th

ed. 2004); *see also Hasty v. Trans Atlas Boats, Inc.*, 389 F.3d 510, 513 (5th Cir. 2004).  The

Jones Act standard of care is that of ordinary prudence under the circumstances.  *Admiralty and*

*Maritime Law* § 6-22, at 338.  The mere fact of an injury, without negligence, does not give rise

to liability:

> [T]he mere fact that an injury has occurred does not trigger liability under the
> Jones Act.  An injured seaman must produce evidence that the shipowner, his employees,
> or agents were negligent.  Negligence is the failure to use ordinary care under the
> circumstances; the doing of some act that a reasonably prudent person would not do; or
> the failure to do something that a reasonably prudent person would do under the same or
> similar circumstances.  This negligence standard also is hand-in-glove with the
> employer's basic duty under the Jones Act – to exercise reasonable care to provide the
> seamen with a safe place to work.

*Id.* at 348.

>    **2.    Unseaworthiness under General Maritime Law.**

A Jones Act seaman "may also sue the owner of any vessel on which he is working for a

breach of the warranty of seaworthiness."  *Becker v. Tidewater, Inc.*, 335 F.3d 376, 387 (5th Cir.

2003).  In order to recover for the alleged unseaworthiness of the *Seaway Rover*, Broussard must

show that Stolt "provided a vessel (including its appurtenances, gear and equipment) that was not

reasonably fit for its intended purposes."  *Phillips v. Western Co. of North America*, 953 F.2d

923, 928 (5th Cir. 1992).  "[A]n unsafe method of work may . . . render a vessel unseaworthy."

---

[1]        It is uncontested that Broussard is a seaman under the Jones Act.

*Id.*; *see also Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 518, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).  An unseaworthiness remedy under general maritime law requires proof of legal cause in the traditional tort sense, as opposed to the lessened burden of proof required in Jones Act claims.  Frank L. Maraist & Thomas C. Galligan, Jr., *Personal Injury in Admiralty* § 6-3(e), at 101-02 (2000).  An unseaworthy condition is the legal cause of an injury if it "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."  *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991).

   **3.**  **Contributory negligence.**

  A seaman's contributory negligence "does not bar recovery, but diminishes damages on the basis of comparative negligence in proportion to the amount of negligence attributable to contributory fault."  *Admiralty and Maritime Law* § 6-22, at 351;  *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989), *aff'd on other grounds*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).  The standard applicable to a claim of contributory negligence is that of ordinary prudence under the circumstances.  *Gautreaux*, 107 F.3d at 338.

**B.**  **Evidence submitted.**

   **1.**  **Background.**

  In April 2000, Broussard began working for Stolt as a chief engineer.  When he was hired Broussard participated in a basic training course, which included an explanation of the proper techniques of manual lifting.[2]  Additionally, Broussard studied Stolt's policy on "Risk Assessment," part of which involves conducting a toolbox talk or job safety analysis (JSA) "for

---

   [2]   *See* Exhibits T-25 and T-52.

the purpose of ensuring all personnel fully understand the work, the control measures, and their responsibilities in executing them."[3]  The risk assessment also instructs Stolt employees to call a halt to any tasks that they believe are unsafe.[4]  On September 23, 2003, Stolt assigned Broussard to be the relief chief engineer aboard the *Seaway Rover*, temporarily replacing Chief Engineer Jose Marcos Arias Ayala.  Broussard was 54 years old, and had over thirty years of experience as a maritime engineer on vessels throughout the world.

Arias was employed by Oceanwide International, a maritime employment leasing firm, which contracted to furnish licensed, trained, and competent employees.  Arias, who had over twenty-five years of experience as a maritime engineer,  had been a member of the crew of the *Seaway Rover* since 1999. Arias was trained in compliance with the International Convention on Standards of Training, Certification, and Watchkeeping (STCW), which the United States has ratified.  Additionally, Arias received training during Stolt's safety meetings, including instruction on manual lifting.[5]

Five days after being assigned to the *Seaway Rover*, Broussard was injured as he assisted Arias in moving a 79-pound fuel transfer hose to a bunkering station located aft on the main deck.  According to Arias, the fuel transfer hose was stored in the aft rudder compartment due to its proximity to the fuel bunkering station.

---

[3]     *See* Stolt "Safety and Environmental Handbook" (Exhibit T-27) at p. 64; *see also* Stolt's "Barge & Ship Health, Safety and Environment Practice" manual (Exhibit T-23) at p. 12, Section 5.6 (requiring a "Hazard Identification and Risk Assessment" before carrying out tasks, and providing that a supervisor should conduct a toolbox meeting to ensure that safety precautions are brought to the attention of the individuals performing an assigned task).

[4]     Exhibit T-27 at p. 4 ("Each employee is responsible for . . . [s]topping an activity or shutting down any operation, which is unsafe (including those of subcontractors).").

[5]     Deposition of Jose Marcos Arias Ayala (Exhibit T-53) at pp. 28-29.

The aft rudder compartment was located below the main deck, requiring the fuel transfer hose to be lifted through a hatch to reach the deck.  Arias testified that in order to get the hose to the main deck, he tied a rope to the coiled hose while it lay on the floor of the rudder compartment, ascended the hatch ladder to the main deck, and pulled the coiled hose up using the rope, without assistance from other crew members.[6]  On other occasions, Arias would place the coiled hose on his shoulder and push it up as he climbed the ladder, while another crewmember would stand on the main deck and pull on a rope tied to the hose.[7]  Arias testified that these procedures were in place when he arrived on the *Seaway Rover*.[8]  The *Seaway Rover*'s captain, Kai Lohmeyer, knew of these procedures used to lift the hose to the main deck, and testified that even though Arias sometimes used two or more crew members to do so, in his opinion "[o]ne man would be enough" for the job.[9]

Arias testified that he did not conduct a toolbox meeting in connection with the fuel transfer because it was a simple, routine procedure that experienced seamen should have understood.  Broussard and Arias testified that they were the only ones who were involved in moving the hose to the main deck on this occasion.  Arias told Broussard he was going into the compartment to retrieve the fuel transfer hose and asked Broussard to throw a rope down to him.

Through the open hatch, Broussard saw Arias roll the coiled fuel transfer hose to the base

---

[6]     Arias testified that he lifted the hose from the rudder compartment to the main deck by himself "plenty times," and that it was "not . . . a big, big, big heavy object" for him.  *Id.* at p. 43.

[7]     *Id.* at pp. 46-48.

[8]     *Id.* at p. 45.  Stolt admits that the procedure used by Arias was the normal and customary way the hose was lifted to the main deck.

[9]     Deposition of Kai Lohmeyer (Exhibit T-54) at p. 61.

of the hatch ladder and tie the rope to the hose.  Arias then picked up the coiled hose, placed it on the third rung of the ladder, and began to climb the twelve foot ladder while pushing the hose up with his shoulder.  At trial Broussard testified that he wrapped the rope around his hand to keep pressure on the line, but that he did not pull the rope up.  In a statement he gave after the incident to a Stolt claims representative, Broussard indicated he helped pull the coiled hose up to the deck.[10]  Arias confirmed that Broussard pulled the hose up while he pushed from below.  The end of the rope was "dogged" by Broussard to a hinge on the hatch cover as the coil moved toward the deck.

After Arias had ascended about halfway up the ladder, Broussard felt a "violent tug" in his back, and a pain developed up from the base of his spine.  Broussard wrapped the slack that had developed on the rope to the hatch dogs, and told Arias that he had been injured.  Arias denies losing control of the hose or dropping it during the maneuver.[11]

Broussard testified that, although he considered this procedure unsafe, he did not stop Arias because he had insufficient time to do so.  Moreover, Arias had not yet turned over the vessel's engineering operations to him, and he was following Arias' lead.

After his injury, Broussard went to his cabin and took an over-the-counter pain reliever for his back.  The pain did not go away, and two days later Broussard was told he could no longer work on the vessel.

5.      **Expert testimony.**

a.      **Dr. Gary Nelson.**

---

[10]      Exhibit T-31 at p. 14.

[11]      Exhibit T-53 at p. 53.

Dr. Gary Nelson testified for the plaintiff as an expert in safety engineering, safety management, and human factors engineering.  In Dr. Nelson's opinion, the *Seaway Rover*'s fuel transfer hose should have been stored on the main deck because of the hazard posed by having to lift it to the main deck to use it.  Dr. Nelson testified that, if it was not possible to store the hose on the main deck, a mechanical device should have been used to lift it from the aft rudder compartment.

In Dr. Nelson's opinion, it was a "basic error" for Arias to push the hose up with his shoulder while he climbed the hatch ladder.  According to Dr. Nelson, this procedure is prohibited by every standard in existence and by Stolt's own Safety and Environmental Handbook[12] because ladders require three points of contact at all times, and this is not possible if one hand is being used to carry equipment.

Dr. Nelson opined that the procedure used by Arias placed Broussard and Arias at risk. Because the coaming of the hatch extended out from the hatch opening, Broussard was forced to bend at an awkward angle to stabilize or pull on the rope attached to the fuel transfer hose.[13] Additionally, Broussard could not predict the moment when his back would be stressed while he pulled on the rope, and even a slight, unexpected jerk carried a high risk of injury.

Dr. Nelson believed that Stolt's lifting training was inadequate.  Dr. Nelson agreed with Stolt's restriction of lifting no more than 55 pounds, but opines that Stolt's published documents inadequately explain proper lifting techniques.  Dr. Nelson testified that crew members should

---

[12]     Exhibit T-27 at pp. 98-99 (providing that ladders should be used "only for their intended purposes," and cautioning that "[w]hen climbing a ladder, never carry an object that may interfere with balance").

[13]     *See* Exhibit T-32, photographs 17-18.

have been taught the importance of leg stability, proper posture, the danger of twisting the body, the biomechanics of lifting, and the risks of improper lifting.

### b.        Captain John C. Manders.

Captain John C. Manders was called by the plaintiff as an expert in maritime operations. Captain Manders testified that in the maritime industry, a relief engineer must learn the operational systems of a vessel from its assigned engineer, and Broussard was accordingly an assistant engineer on the *Seaway Rover* who was "under orders" from Arias.

Captain Manders testified that the custom and practice in the offshore industry is that fuel transfer hoses are stored in racks or cabinets on the main deck.  Captain Manders had a "poor opinion" of the procedure used by Arias to retrieve the hose.  He testified that Arias violated Stolt's policies by failing to address risk assessment and conduct a job safety analysis or toolbox meeting with Broussard.  Additionally, Arias violated the directives in Stolt's Safety and Environmental Handbook by overloading himself, failing to use proper lifting techniques, using a ladder for a purpose other than that for which it was intended, and carrying an object that interfered with his balance.[14]

Captain Manders testified that Arias had "good options" available to him other than pushing the coiled hose up the ladder with his shoulder while Broussard pulled from above.  The fuel transfer operation took place at the Port Fourchon dock, where there is a crawler crane present that could have lifted the hose to the main deck.  Arias also had the option of unrolling the hose, passing one end up to Broussard, climbing up the ladder, and assisting Broussard in pulling the uncoiled hose through the hatch.  Finally, Arias could have constructed a lifting

---

[14]        Exhibit T-27 at pp. 97-99.

8

device.

          **c.**      **Donald Green.**

Donald Green testified as an expert for the defendant in the field of marine operations and safety.  Green opined that it was an acceptable marine practice to store the fuel transfer hose in the aft rudder compartment because it is infrequently used.  The hatch leading to the rudder compartment is located near to the fuel transfer station; therefore the hose was more accessible than it would have been if it had been stored on the main deck.  Green noted that the Coast Guard conducted a vessel audit on November 5, 2003,[15] and did not find any safety deficiencies in the rudder compartment where the fuel transfer hose was stowed.  Green opined that both Broussard and Arias were properly trained, and received adequate instruction on manual lifting. Green testified that STCW training addresses personal safety, which includes manual lifting techniques.  Green opined that because Arias should have expected that Broussard would know what they were doing based on his years of experience, there was no need to hold a meaningless toolbox meeting or JSA.

Green agreed with plaintiff's experts that the procedure used by Arias to retrieve the fuel transfer hose was unsafe, and was a violation of Stolt's policies.  Green agreed with Captain Manders that it was safer to uncoil the fuel transfer hose and feed it out of the hatch, and indicated that it would also have been acceptable for two people to lift the coiled hose out of the hatch.  However, Green opined that it was Broussard's responsibility to conduct his own risk assessment and stop Arias when he realized the procedure was unsafe.  Green testified that it was "inconceivable" to him that Broussard remained silent while Arias pushed the hose up with his

---

[15]      Exhibit T-17.

shoulder as he climbed the ladder.

Green testified that Broussard should not have leaned over the hatch to tie the slack that developed in the rope to the "dogs" (latches) of the hatch.  By bowing his back and leaning over the hatch, Broussard used an awkward, incorrect, and unsafe posture, which was contrary to the training he had received and was not an exercise of ordinary prudence under the circumstances. Additionally, Broussard could have used proper posture while pulling on the rope by standing on the hatch coaming or by walking away from the hatch with the rope wrapped around his body (the "Alpine method").[16]

**C.    Analysis.**

   **1.    Liability.**

Broussard argues that Stolt was negligent under the Jones Act because (1) the crew of the *Seaway Rover* should not have stored its fuel transfer hose in the aft rudder compartment, (2) Stolt failed to train Arias properly in manual lifting techniques, (3) Arias failed to conduct a toolbox meeting prior to retrieving the fuel transfer hose, and (4) Arias used an unsafe procedure to lift the fuel transfer hose to the main deck.  Broussard argues that the *Seaway Rover* was unseaworthy under general maritime law because (1) it was improper to store the fuel transfer hose below the main deck, (2) Arias was inadequately trained, and (3) Arias used an unsafe procedure to lift the fuel transfer hose to the main deck.

The court finds that Stolt is liable both under the Jones Act for negligence and for unseaworthiness under general maritime law.  Arias failed to act with ordinary prudence under the circumstances by using an unsafe method to lift the fuel transfer hose to the main deck, and

---

[16]     Neither of plaintiff's experts challenged this method as unsafe.

this conduct was negligence under the Jones Act.  Additionally, the procedure instituted aboard the *Seaway Rover* for lifting its fuel transfer hose to the main deck was unsafe, rendering the vessel unseaworthy under general maritime law.  All three experts agree that the procedure used by Arias, which was begun before he arrived on the vessel in 1999, was unsafe.  As Captain Manders testified, there were several "good options" available to lift the fuel transfer hose to the main deck.[17]

The court assigns 40% contributory fault to Broussard.  Broussard had the obligation of telling Arias to stop lifting the hose once he perceived it was unsafe.  Additionally, Broussard knew that he could have uncoiled the hose to pull it up, and all three experts testified that this would have been a safe method of lifting the hose to the main deck.  Contrary to Stolt's training, the posture Broussard used was unsafe because he leaned over the aft rudder compartment hatch and extended his arms while attempting to guide or pull on the rope attached to the coiled fuel transfer hose, exposing himself to the injury he sustained.[18]

---

[17]     Because of the finding of negligence and unseaworthiness in the procedure implemented by Stolt, it is not necessary to address plaintiff's additional theories.

[18]     Stolt argues that Broussard should be assessed a large percentage of comparative negligence because he willfully concealed a pre-existing back condition which caused him to be especially susceptible to injury.  There is no evidence that Broussard was aware that he had a condition which would have precluded his work on the *Seaway Rover*.

2.       **Limitation of Liability.**

The Limitation of Liability Act, 46 U.S.C.App. § 181 *et seq.*, permits a vessel owner to

limit its liability for damage or injury to the value of the owner's interest in the vessel:

> The liability of the owner of any vessel, whether American or foreign, for any
> embezzlement, loss, or destruction by any person or any property, goods, or merchandise
> shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or
> for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred,
> without the privity or knowledge of such owner or owners, shall not, except in the cases
> provided for in subsection (b) of this section, exceed the amount or value of the interest
> of such owner in such vessel, and her freight then pending.

*Id.* at § 183(a).  Under the Act, a claimant must first establish negligence or unseaworthiness,

and the burden then shifts to the owner of the vessel to prove that the negligence or unseaworthy

condition was not within its privity or knowledge:

> The Limited Liability Act allows a vessel owner to limit its liability for any loss or injury
> caused by the vessel to the value of the vessel and its freight.  "Under the Act, a party is
> entitled to limitation only if it is 'without privity or knowledge' of the cause of the loss."
> If the shipowner is a corporation, "knowledge is judged by what the corporation's
> managing agents knew or should have known with respect to the conditions or actions
> likely to cause the loss."  Once the claimant establishes negligence or unseaworthiness,
> the burden shifts to the owner of the vessel to prove that negligence was not within the
> owner's privity or knowledge.

*In re Hellenic, Inc.*, 252 F.3d 391, 394 (5th Cir. 2001).  The phrase "privity or knowledge" is not

defined in the Act.  The Fifth Circuit has held that privity or knowledge "must turn on the facts

of the individual case."  *Id.* at 395.  A shipowner "has privity if he personally participated in the

negligent conduct or brought about the unseaworthy condition."  *Trico Marine Assets, Inc. v.*

*Diamond B Marine Serv., Inc.*, 332 F.3d 779, 789 (5th Cir. 2003).

Because Broussard has established that Stolt was negligent and the *Seaway Rover* was

unseaworthy, the burden shifts to Stolt to prove a lack of privity or knowledge.  The court finds

that Stolt has not satisfied this burden.  46 U.S.C. App. § 183 provides:

12

(e) Privity imputed to owner

In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel.

The testimony of Captain Lohmeyer, the master of the *Seaway Rover*, demonstrates that he was familiar with the unsafe procedure regularly used to lift the fuel transfer hose to the main deck. Captain Lohmeyer's actual knowledge of this unsafe procedure is conclusively deemed to be that of Stolt. Additionally, a corporate shipowner "may be deemed to have constructive knowledge if the unseaworthy or negligent condition could have been discovered through the exercise of reasonable diligence." *Brister*, 946 F.2d at 356; *see also Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993) ("'Privity or knowledge,' sometimes described as 'complicity in the fault,' extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation."), *cert. denied*, 510 U.S. 1113, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1994). Arias testified that the crew of the *Seaway Rover* began storing its fuel transfer hose in the aft rudder compartment before he became the vessel's chief engineer in 1999, and that he used the same procedure to lift the hose to the main deck that had been instituted before his arrival. Considering that this procedure was used on the vessel for at least four years, the exercise of reasonable diligence would have caused Stolt to discover the unsafe manner in which the fuel transfer hose was being moved to the main deck. Stolt is therefore not entitled to limit its liability to the value of the *Seaway Rover*.

D.      **Conclusion.**

The court finds (1) that Stolt is vicariously liable for Chief Engineer Arias' negligence in using an unsafe procedure to lift the *Seaway Rover*'s fuel transfer hose to the main deck, (2) that the *Seaway Rover* was unseaworthy because of this unsafe procedure, (3) that Broussard is assigned 40% contributory negligence, and (4) that Stolt is not entitled to limit its liability to the value of the *Seaway Rover*.

New Orleans, Louisiana this _26th_ day of April, 2006.


_Mary Ann Vial Lemmon_
**Mary Ann Vial Lemmon**
**United States District Judge**

14