UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


NOLAN BROUSSARD, JR.                          CIVIL ACTION

VERSUS                                        NO:  04-2471

STOLT OFFSHORE, INC.                          SECTION: "S" (5)


FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Nolan Broussard, Jr., was injured on September 28, 2003, while working as a
Jones Act seaman aboard the vessel, *M/V Seaway Rover.*  He sued defendant, Stolt Offshore,
Inc., under the Jones Act, 46 U.S.C. § 688, alleging the negligence of a fellow crew member, and
under general maritime law for the unseaworthiness of the *Seaway Rover.*  The issues of liability
and damages were severed.  In the trial on liability, the court concluded that defendant was liable
under the Jones Act for negligence and for unseaworthiness under general maritime law.  The
court assigned 40% contributory negligence to plaintiff.  (Doc. #36).

The issue of damages, which  proceeded later as a one-day, non-jury trial, is now before
the court.

I.    **Medical Evidence.**

Plaintiff, who was 52.38 years old at the time of the accident,  testified that prior to the
accident he was very active and had been employed in the maritime industry for thirty-four
years.  He admitted to minor aches and pains while working, but controlled these symptoms with
over-the-counter medication such as Tylenol, Advil, Icy Hot and Doan's pills. Although it is

uncontested that as early as 1997, x-rays of plaintiff's spine suggested that he may have had spondylolisthesis, there is no evidence that he knew about the condition.

As a part of his employment with this defendant, plaintiff was required to undergo periodic Merchant Marine Personnel physical examinations.  During the examination, plaintiff was required to move 100 pounds of rope fifty feet; lift a five gallon bucket weighing fifty-two pounds and carry it up and down a set of stairs; pull 160 pounds in a sled for fifty feet; hang from a rope for fifteen seconds; and thread nuts and bolts of various sizes with his hands while squatting in a position for two minutes.  A Merchant Marine Personnel Physical Certificate was issued to plaintiff on April 20, 2000; October 1, 2001; and on February 5, 2003, certifying that plaintiff had been found competent for further employment with the defendant.

On September 28, 2003, plaintiff was serving as the relief chief engineer on the *Seaway Rover* and was injured while assisting the chief engineer in moving a seventy-nine pound fuel transfer hose to a bunkering station located aft on the main deck.  After sustaining what he described as a jerk, like an electrical shock, he went to his cabin and took Doan's pills.  The following day he was transported to Golden Meadow, where he was seen by Dr. Eddie Smith at the walk-in clinic.  Dr. Smith examined plaintiff and allowed him to return to the vessel with a light duty restriction.

Plaintiff returned to the vessel, but defendant sent him home and instructed him "to take a few days."  On October, 6, 2003, due to "unbearable" pain, plaintiff was taken by ambulance from his residence to a hospital in Lafayette, where he was examined by Dr. Michael J. Duval, an orthopedic surgeon hired by defendant.  Dr. Duval diagnosed spondylolisthesis accompanied

by degenerative arthritis throughout his lumbar spine, and administered morphine.  Plaintiff was treated conservatively over a period of a few weeks, during which time he received physical therapy, narcotic pain medication, and a flouroscopically guided lumbar epidural steroid injection performed by Dr. Sanjiv Jindia.

On November 6, 2003, because plaintiff was not improving, he sought a second opinion from Dr. Michael Heard, an orthopedic surgeon in Lafayette.  Over the next few months, Dr. Heard ordered several rounds of physical therapy, prescribed narcotic pain medication, and restricted plaintiff's activity.  Dr. Heard ordered three lumbar epidural steroid injections during the winter of 2003 and spring of 2004 and prescribed a rigid back brace.  On March 16, 2005, myelogram and post-myelogram CT scans showed spondylolisthesis at the L5 level, and bulging discs with mild displacement of the nerve roots at L3-4, L4-5, and L5-S1.  Dr. Heard recommended a lumbar fusion, but before approval was obtained, defendant requested an examination by Dr. John Schutte, an orthopedic surgeon in Lafayette.  Dr. Schutte examined plaintiff on April 29, 2004, and agreed that the fusion was appropriate.

Dr. Louis Blanda, an orthopedic surgeon specializing in spinal surgery, examined plaintiff and reviewed his films, and recommended a decompression procedure and three-level fusion  with instrumentation involving L3-4, L4-5, and L5-S1.  This procedure was performed on August 11, 2004 and involved a traverse process fusion with the installation of rods and pedicle screws, and a bone graft over the three vertebral spaces being fused.  Dr. Blanda has remained plaintiff's treating physician since the surgery.

Following surgery, plaintiff continued to complain of pain, and a CT scan on September

3

19, 2005 showed that, although the hardware holding plaintiff's vertebrae together was in place, the bone graft was not forming a solid fusion.  A CT scan on January 23, 2006 confirmed the incomplete bone fusion.  On June 21, 2006, another CT scan was obtained, and read by Dr. Jeffery LaBorde.  Dr. LaBorde performed a comparison study of all three CT scans and found that there had been progressive "resorption" or "nonfusion" of the bone graft.  On June 29, 2006, Dr. Blanda discussed with the plaintiff the possibility of surgery to re-graft the fusion area using bone from his iliac crest.  Plaintiff is reluctant to undergo further surgery if he can manage the pain with medication, but because he does not want to continue to be disabled, will probably consent to have the surgery.  Dr. Blanda thinks plaintiff is "likely going to need another operation."

According to Dr. Blanda, plaintiff has not reached maximum medical improvement and will require lifelong pain management, the use of neurontin to relieve nerve pain, and ongoing monitoring of his spinal condition.  Dr. Blanda opines that plaintiff is disabled from manual labor and, therefore, from gainful employment because he is unable to sit or stand for prolonged periods, and because of his pain and need for medication.  He also has restricted plaintiff to lifting less than ten pounds.

On July 11, 2006, Dr. Schutte evaluated the plaintiff on defendant's behalf, and concluded that plaintiff does not require additional surgery.  Dr. Schutte found the rods and pedicle screws to be secure.  He does not think a re-graft is medically necessary.  Dr. Schutte concurs that plaintiff will require long-term pain management, but suggests that non-narcotic medication will be sufficient.  Dr. Schutte opines that the plaintiff might be able to find

4

employment in the light or light to medium labor market.

Based on the medical evidence, the court finds the accident aboard the *Seaway Rover* caused the injury which necessitated the three-level fusion and plaintiff's resulting disability. Although plaintiff had a pre-existing condition which made him more susceptible to injury, his prior asymptomatic condition was made symptomatic by that accident. Defendants are liable for the aggravation and activation of the pre-existing asymptomic spondylolisthesis. Additionally, the court finds credible Dr. Blanda's testimony that plaintiff will require future surgery. The court finds the surgery proposed by Dr. Blanda to be not merely palliative, but medically necessary to address the injury sustained aboard the *Sea Rover*.

## II.   General Damages.

Because of the injury aboard the *Seaway Rover*, plaintiff is severely disabled. Before the injury, he had an excellent work history in the offshore industry. Surveillance films of him interacting with his family show that he is unable to enjoy many of the simple pleasures associated with normal life. He is shown sitting down as he attempts to participate with his 15 year old son in playing basketball. It also shows he is unable to perform simple tasks like gardening and other tasks which his wife now has to perform. He is shown walking guardedly around his carport. He is unable to enjoy a normal sex life with his wife. He has undergone a three-level lumbar fusion, and is unable to return to the type of work previously performed. He has lost the ability to enjoy the lifestyle he had before the accident. Considering the testimony and other evidence at trial, and awards in similar cases, the court awards $400,000 in general damages, plus prejudgment interest and costs, subject to a reduction of 40% to account for

plaintiff's contributory negligence.

**III.     Past Medical Expenses.**

There are outstanding medical bills in the amount of $1,885.46 for which Stolt is

responsible.

**IV.     Future Medical Expenses.**

Based on Dr. Blanda's prognosis and treatment recommendation, Dr. Bernard F.

Pettingill, an expert economist, calculated plaintiffs future medical expenses through plaintiff's

life expectancy from date of trial of 23.9 year, as follows:

| | |
|---|---|
| Orthopedic surgeon, two visits per year: | $     5,665.00 |
| Medications, other than Neurontin: | $   33,712.00 |
| Neurontin: | $   53,155.00 |
| Routine x-rays, once per year: | $     4,383.00 |
| CT scans, every three to five years: | $     4,355.00 |
| Routine laboratory costs: | $     4,707.00 |
| TOTAL: | $ 105,977.00 |

In addition, based on Dr. Blanda's testimony, the cost of future bone graft surgery is $46,000.00,

bringing the total future medical expenses to $151,977.00.

The court finds the future medical expenses set forth by Dr. Blanda and Dr. Pettingill are

supported by the evidence, and awards $151,977.00 in future medical expenses.

**V.     Economic Loss.**

A seaman claiming to have sustained personal injury may be entitled to recover past and

future economic losses.  *Culver v. Slater Boat Co.,* 722 F.2d 114, 122 (5th Cir. 1983).  The

purpose of such an award is to "provide the victim with a sum of money that will, in fact, replace

the money that he would have earned." *Id.* at 120.  Past economic losses are generally measured

by the actual wage loss incurred by the plaintiff to the date of trial, and may include lost fringe

benefits if proved.  *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487 (5th Cir. 1985).

Future economic losses include loss of earning capacity and fringe benefits.  When determining

future economic losses, the court must consider whether the plaintiff will be totally or partially

disabled so that his future earnings will be diminished.  *Johnson v. Offshore Express, Inc.,* 845

F.2d 1347, 1357 (5th Cir. 1988).  Variables to consider in determining future economic losses

include work life expectancy, the plaintiff's past wages, overtime, and vacation pay.  *Michel v.*

*Total Transp. Inc.*, 957 F.2d 186, 192 (5th Cir. 1993).  The award should be discounted to

account for the fact that the plaintiff will receive a payment in a lump sum, rather than over a

period of years in the future.  *Culver,* 722 F.2d at 120.

> **1.      Past Economic Loss.**

There is no basic disagreement in the two economists' calculations of past economic loss

for the 2.7 years from the date of the accident to trial.  The court determines the amount to be

$180,094.00.

> **2.      Future Economic Losses.**

> **a. Functional Capacity.**

Plaintiff is a high school graduate who has held a 10,000 horsepower engineer's license

for 25 years and is a certified crane operator.

Glenn Hebert, a vocational consultant called by the plaintiff, evaluated plaintiff based on his reading, writing, and math skills, and concluded that although plaintiff might be capable of vocational retraining, he could not perform sedentary work unless his pain subsided.  As long as the pain remains, plaintiff's chances of returning to work are unlikely because employers are reluctant to hire individuals out of fear of becoming responsible for future medical expenses.  Thus, while plaintiff might be employable, he likely is not placeable in the workforce.

Dr. John Grimes, a vocational rehabilitation consultant for the defendant, evaluated plaintiff's intellectual ability, academic ability, aptitudinal abilities, and interest.  Dr. Grimes noted that plaintiff performed well on the intellectual capacity and academic testing, which indicated he was capable of completing vocational technical school or many college curriculums.  According to Dr. Grimes, plaintiff's work history and testing indicates that, if he is cleared to return to light duty work by his physician, he could obtain a job as a marine or non-marine dispatcher.  However, if he is not cleared for light duty work, he would not be employable.

Dr. Richard Bunch, a physical therapist, attempted to administer a functional capacity examination on June 26, 2006.  However, because of plaintiff's severe high blood pressure during the physical examination, Dr. Bunch was unable to complete the evaluation.  His findings are of no value to the court.[1]

The "treating physician rule" requires the court to defer to a patient's treating physician's

_____

[1]Dr. Bunch attempted to suggest that Broussard did not want to return to work.  Bunch retracted that suggestion when questioned by the court, and clarified that Broussard answered generic questions about retirement based on his assumption that he was unable to return to work.

testimony unless substantial evidence contradicts the testimony. *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1016 (5th Cir. 1992). Dr. Blanda is more familiar with the patient, his injury, course of treatment, and responses to treatment over a considerable length of time compared to defendant's physician, Dr. Schutte. The court accepts the testimony of the treating physician, Dr. Blanda, that Broussard is restricted from performing manual labor and unable to stand or sit for prolonged periods, and that his pain will be ongoing. Based on the finding, the court accepts as credible the testimony of Glenn Hebert that Broussard is not likely placeable in the work force because of his ongoing pain.

### b.  Future Loss of Earning Capacity.

When considering plaintiff's future loss of earning capacity, Dr. Pettingill determined plaintiff's worklife expectancy from date of trial to be eleven years or to age of sixty-six, which is the year plaintiff is projected to retire and qualify for full benefits based on the Social Security Administration report. At the request of defendant, Dr. Pettingill also calculated future economic losses using a worklife expectancy of age sixty-four and sixty-five years of age. In determining plaintiff's future loss of earning capacity, Dr. Pettingill accounted for income taxes, inflation, and used a discount rate of 2.04 percent. Using a five year average of plaintiff's prior earnings, Dr. Pettingill determined the annual wage base to be $73,450. Dr. Pettingill determined the present value of plaintiff's future loss of earning capacity to be:

|  |  |
|---|---|
| To age 64: | $639,437.00 |
| To age 65: | $707,310.00 |
| To age 66: | $774,445.00 |

Dr. Kenneth Boudreaux, who testified on behalf of defendant, determined plaintiff's

offshore worklife to be 6.31 years at the time of trial, or to age 61.57, based on the Department of Labor's Bureau of Labor Statistics.  The basic figures including wage base, discount rate, and value of fringe benefits are consistent with plaintiff's expert, Dr. Pettingill.  Defendant convincingly argues that because of plaintiff's pre-existing spondylolisthesis, his work life expectancy was diminished.  However, Dr. Boudreaux does not make a calculation which takes into account the finding of the court that this plaintiff will be unable to return to work.  Therefore, the worklife expectancy is determined to be to age 64, with an economic loss of $639, 437.00.

### c.  Loss of Future Fringe Benefits.

In calculating future fringe benefits, Dr. Pettingill considered found[2] and vacation, sick leave, health insurance, and 401K.

According to Dr. Pettingill, the present value of fringe benefits calculated for a work life expectancy of age 64 is $124,225.00.

Defendant's expert, Dr. Boudreaux, did not calculate fringe benefits because he was not provided with the proper information.  However, citing the U.S. Statistical Abstract for 2004-2005, he noted that the typical fringe benefits package was "approximately fourteen percent over and above wages."  Dr. Boudreaux did not calculate found.

---

[2]Because found and maintenance overlap, it is unnecessary to include a separate calculation for maintenance.

Based on the evidence presented, the court awards $124,225.00 in loss of future fringe benefits.

**VI.     Punitive Damages and Attorney Fees**

Plaintiff was paid maintenance and cure until May 18, 2006 when Stolt determined Broussard had reached maximum medical improvement.

The court finds the acts of Stolt in terminating maintenance and cure was not egregious. Broussard's claims for punitive damages and attorneys' fees are denied.

**VII.    Conclusion**

This court concludes that Broussard is entitled to the following damages as a result of his injury aboard the *Seaway Rover*:

| | |
|---|---|
| General Damages | $400,000.00 |
| Past economic loss | 180,094.00 |
| Future loss of earning capacity | 639,437.00 |
| Future fringe benefits | 124,225.00 |
| Past medical expenses | 1,885.46 |
| Future medical expenses | 151,977.00 |

The above amounts are subject to a reduction of 40% to account for plaintiff's contributory negligence.

New Orleans, Louisiana, this  9th  day of January, 2007.

MARY ANN VIAL LEMMON

UNITED STATES DISTRICT JUDGE

11